# United States District Court

NORTHERN DISTRICT OF GEORGIA

FILED IN CLERK'S OFFICE
U.S.D.C. Gainesville

OCT 2 6 2011

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

UNITED STATES OF AMERICA
v.

ANTONIO L. BROWN

**CRIMINAL COMPLAINT**

CASE NUMBER: 2:11-MJ-98-SSC

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about <u>October 25, 2011</u>, in <u>Jackson</u> County, in the Northern District of Georgia defendant(s) did, (Track Statutory Language of Offense)

knowingly possess a FN Manufacturing, Model FNP-40, .40 caliber handgun, a FN Manufacturing, Model FNP-9. 9mm handgun, a Ruger Model SR40C, .40 caliber handgun, two Ruger Model SR9C, 9mm handguns, and other firearms, as further described in the attached affidavit, after having been convicted of the felony offenses of aggravated assault, robbery and possession of a firearm by a convicted felon, as set forth in the attached affidavit, each offense being punishable by imprisonment for a period of more than one year, and said possession being in and affecting interstate commerce,

in violation of Title <u>18</u> United States Code, Section(s) <u>922(g)</u>.

I further state that I am a(n) Special Agent with the Bureau of Alcohol, Tobacco, and Friearms and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof.    (X) Yes ( ) No

_____
Signature of Complainant
LANCE D. GREER

Based upon this complaint, this Court finds that there is probable cause to believe that an offense has been committed and that the defendant has committed it. Sworn to before me, and subscribed in my presence

<u>October 26, 2011</u>                                              at    <u>Gainesville, GA</u>
Date                                                                            City and State

SUSAN S. COLE
United States Magistrate Judge                                    _Susan S. Cole_
Name and Title of Judicial Officer                                Signature of Judicial Officer
AUSA William L. McKinnon, Jr.

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Lance D. Greer, being duly sworn, depose and state the following:

1. I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed since January of 1992. I am currently assigned to the Atlanta VII Field Office, which is involved in various facets of ATF's enforcement programs. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy.

2. This affidavit is submitted in support of an application for the issuance of a complaint charging Antonio L. BROWN the offense of possession of firearms by a previously convicted felon. The information contained in this Affidavit is based upon the affiant's personal knowledge and observations, interviews with persons, review of government records, and of records, reports and information received from other law enforcement and ATF sources. This Affidavit is not intended to convey all the facts of the entire investigation, but rather to establish cause to support the request for Federal arrest authorization.

### The Statutes

3. *Title 18, United States Code, Section 922(g)(1):*

   It shall be unlawful for any person -

   > who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year; to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

### The Investigation

4. On October 25, 2011, while on patrol in the vicinity of Interstate 85 North and Exit #147, Commerce, GA Police Department (CPD) Officer Eric Cook observed a moving violation committed by a silver 2005 Pontiac Grand Am, bearing New Jersey license plate ZNB79S. Specifically, Officer Cook observed the Grand Am traveling in the "fast lane" or left passing lane at approximately sixty-five (65) miles per hour, holding up faster moving traffic. As Officer Cook positioned his patrol vehicle behind the Grand Am, Officer Cook observed the Grand Am make an abrupt right lane change without utilizing the turn signal, therefore almost hitting the front of a red Chevrolet pick-up truck. At this time, Officer Cook initiated a traffic stop upon the Grand Am.

4. Officer Cook approached the passenger side of the Grand Am and requested the driver of the vehicle driver's license, in which the driver Paul L. Boykin stated his driver's license was suspended, but he had a Georgia Identification Card. Boykin informed Officer Cook that his license had recently been reinstated but had no documentation to verify his license reinstatement. At this time, Officer Cook ran Boykin's driver's license status in the Georgia Crime Information

Center (GCIC) / National Crime Information Center (NCIC) and confirmed Boykin's driver's license was currently suspended in both the State of Georgia and the State of New Jersey. Boykin explained that the vehicle was registered to his girlfriend, Miajja Carmen. At this time, Officer Cook requested Boykin step to the rear of the vehicle and then engaged the passenger in conversation.

5. The passenger of the Grand Am identified initially himself as Rajee Ramellow Brown, with a date of birth of 04/16/1986. However, Officer Cook stated that he observed Rajee Ramellow Brown having difficulty spelling his name. Officer Cook then inquired into Boykin as to the passenger's name, and he stated he only knew him as "Tone", and believed his name to be Antonio. Boykin stated he and Brown had been friends since high school but he never knew his full name. BROWN eventually informed Officer Cook his name was Antonio LaQuinn BROWN, and that he may possess outstanding warrants.

6. Officer Cook then asked Boykin if there was anything "illegal" inside the vehicle, such as contraband, guns, or drugs, and Boykin replied "no". Officer Cook then asked Boykin for consent to search the Grand Am and Boykin stated "yes, go ahead."

7. Officer Cook and CPD Sergeant Kay Coombs searched the Grand Am where Officer Cook searched the trunk from the rear seat area of the car. Officer Cook located a black in color plastic case (gun case) that contained a semi-automatic handgun. Officer Cook also noticed several similar containers which were stacked on top of each other in the trunk. At this time, Sgt. Coombs advised Boykin and BROWN of their Miranda Warnings in which both subjects advised that they understood and wished to speak to a lawyer. At this time, Officer Cook and Sgt. Coombs removed the following firearms from the trunk of the Grand Am:

- FN Herstal, Model F.S10M, 5.7mm x 28mm caliber handgun, serial number: 286220877

- FN Manufacturing, Model FNP-40, .40 caliber handgun, serial number: 61CMN05638

- FN Manufacturing, Model FNP-9, 9mm handgun, serial number: 61BMN06547

- Taurus, Model M4510 "The Judge", .410 shotgun / .45LC caliber pistol, serial number: CY971521

- Ruger, Model SR40C, .40 caliber handgun, serial number: 343-12568

- Ruger, Model SR9C, 9mm handgun, serial number: 332-89968

- Ruger, Model SR9C, 9mm handgun, serial number: 332-70195

- MasterPiece Arms, Model MPA930 T, Mini 9, 9mm handgun, serial number: F12069

- Jimenez Arms, Model J.A. Nine, 9mm handgun, serial number: 129990

All of the aforementioned firearms were contained within respective plastic "gun cases" except for the Jimenez Arms 9mm handgun, serial number 129990, which was located wrapped in a plastic grocery bag in a larger black bag along with 408 rounds of various calibers of handgun ammunition and 20 rounds of .410 shotgun shells.

8. Officer Cook informed your affiant that upon transporting Boykin and BROWN to the Commerce Police Department, he placed BROWN in a holding cell. Officer Cook stated that BROWN asked him if they had gotten his "shit" out of the car. Officer Cook inquired into what he was referring to and BROWN stated he wanted his phone and clothing. Officer Cook inquired into BROWN if he also wanted his guns, and BROWN replied "yes", and then stated, Cook "had to go and catch me with all those guns."

9. On October 25, 2011, CPD Investigator Jason Black contacted your affiant and informed of the traffic stop and that both Boykin and BROWN were previously convicted felons. Your affiant caused a query of both Boykin's and BROWN'S criminal history. Your affiant determined per NCIC that both suspects were previously convicted felons, in which BROWN'S criminal history is documented later in this affidavit.

10. On October 25, 2011, your affiant traveled to the Commerce Police Department. At this briefing, your affiant observed the aforementioned firearms and inquired as to whether either suspect could be interviewed. Officer Cook informed your affiant Sgt. Coombs Mirandized both of the suspects and your affiant requested to speak with her. Sgt. Coombs informed your affiant that after Mirandizing each suspect, she inquired if they would be willing to speak with officers regarding the firearms. Sgt. Coombs informed your affiant the suspects stated, "I think I would rather talk to an attorney."

11. At approximately 1:10pm on this date, Boykin was brought to an interview room within the CPD Criminal Investigation Division and was introduced to ATF Special Agent Greer and CPD Inv. Jason Black. It should be noted this brief encounter was audio and video taped. Special Agent Greer started the conversation by confirming the original Miranda Warnings conducted by Sgt. Coombs, and Boykin agreed he had originally informed Sgt. Coombs he wished to speak to an attorney, and at this time with Special Agent Greer, he stated that he wished to speak to an attorney as to not incriminate himself or others. Special Agent Greer thanked him for his time and Boykin was placed back in the holding cell by officers. As Boykin was leaving the interview room, he stated to your affiant and Inv. Black that upon investigators talking to BROWN, they would learn that he was not involved "in this", and that he would be getting cut loose.

12. At approximately 1:17pm, BROWN was brought to the same interview room and introduced to Special Agent Greer and Inv. Black. This brief encounter was also audio and video recorded. Special Agent Greer again started the conversation regarding the original Miranda Warnings conducted by Sgt. Coombs. BROWN stated he did inform Sgt. Coombs that wished to speak with a lawyer at the arrest scene, and at this time with Special Agent Greer, he stated that he would like an attorney. Your affiant thanked him for his time, but prior to leaving the interview room, BROWN inquired into Special Agent Greer as to what would happen next. Your affiant informed him the United States Attorney's Office would be contacted regarding the arrest, as it was known both he and Boykin were previously convicted felons and were in possession of firearms. At this time, BROWN was led back to the holding cell by officers.

13. Approximately thirty (30) minutes later, your affiant was informed by CPD officers that BROWN now wished to provide a statement to your affiant. After this statement, BROWN was led out of the holding cell building and was being escorted to the CID building. Special Agent Greer was preparing to leave the police department and was located in the parking lot when BROWN encountered your affiant. Your affiant informed BROWN he had invoked his right to counsel and that he could not be interviewed or provide a statement at this time. BROWN informed your affiant he desired to provide a statement and retracted the invocation of his desire to have an attorney present during questioning. At this time, your affiant contacted the United States Attorney's Office and advised of the retraction.

14. At approximately 1:50pm, BROWN was led to the interview room, in which your affiant presented an ATF Advice of Rights and Waiver form. Again, this interview was audio and video recorded. Your affiant again strongly made mention to BROWN that he had just invoked his right to counsel approximately thirty (30) minutes prior. BROWN stated he understood, but wished to make a statement. Your affiant explained the Advice of Rights and Waiver form to BROWN, and inquired if he could read and write the English language in which he confirmed. Your affiant inquired into BROWN'S level of education, or final grade completed, and BROWN stated he left East Orange High School in East Orange, NJ during his senior year in 2001. Your affiant read aloud each of the five "rights" located on the form, and requested BROWN read along. BROWN affixed his initials next to each of these individual rights. Your affiant then read aloud the Waiver portion of the form while BROWN read along. Your affiant inquired if BROWN understood the waiver portion and BROWN confirmed by executing his signature and printed name on the form, and your affiant countersigned the form at 1:54pm.

15. BROWN stated the firearms located by CPD Officer Cook were his, and he wanted officers to let Boykin go. BROWN stated Boykin should not be charged with any firearms offenses. Originally, BROWN stated Boykin was not aware that the firearms were in the trunk of Boykin's girlfriend's car. BROWN stated that he himself placed the firearms into the truck of the Grand Am.

16. Special Agent Greer inquired into BROWN'S criminal history, and BROWN agreed and confirmed that he was convicted of Aggravated Assault in 2004 and Felon in Possession of a

Firearm in 2007. BROWN agreed both offenses were felonies and were adjudicated in the Fulton County, GA Superior Court.

17. Special Agent Greer inquired into BROWN if he was currently under felony indictment from the DeKalb County Superior Court, and BROWN disagreed stating that the charges were dropped.

18. BROWN stated a friend of his purchased the firearms located in the Grand Am from a gun store, but he would not provide the friend's name. BROWN stated he did not purchase the firearms from a gun store himself, as he was a convicted felon. BROWN stated he paid this other person to purchase the firearms.

19. BROWN stated he was transporting the firearms to another person in New Jersey. BROWN would not provide the intended person's name. Your affiant showed BROWN a photograph of the firearms, and BROWN stated he purchased the firearms from the unidentified person, and Boykin did not purchase them. Your affiant inquired into how often, or how many times BROWN had acquired firearms in Georgia and transported them to New Jersey, and BROWN replied, "this was just a one-time thing". BROWN stated he put up the money to purchase the firearms, and someone else bought them. BROWN further stated there was someone expecting the firearms in New Jersey.

20. Your affiant inquired into BROWN as to why he purchased these particular types of firearms, and BROWN stated he paid $3,000 to the person whose name the firearms would be in, and that by purchasing any firearms from this person, "you just get what you're gonna get". BROWN stated he did not pay the original purchaser to purchase the firearms for him, as this person already possessed the aforementioned firearms. BROWN stated he was to be paid $10,000 for purchasing and delivering the firearms to the unknown intended person in New Jersey.

21. BROWN explained that he was out of money after he was recently robbed of $50,000 cash and $30,000 worth of jewelry. BROWN stated that due to his criminal history, it was hard for him to find gainful employment. However, BROWN stated he worked in the music industry booking concerts and was familiar with several high profile rappers and athletes.

22. BROWN stated that he was to pay Boykin $600 for driving him to New Jersey, to include food and expenses, and that upon arrival, Boykin would return to Georgia and he would remain in New Jersey. Your affiant inquired into BROWN if Boykin was making money [$600] to deliver BROWN and the firearms to New Jersey, and BROWN stated he was paying him to drive.

## Records Review

23. On October 25, 2011, your affiant caused a query of the criminal history as it relates to BROWN. A review of BROWN'S criminal history record reveals the following felony convictions:

### Prior STATE Convictions
### (Per NCIC)

| | |
|---|---|
| Arrest Date: | 06/20/2005 |
| Offense: | Aggravated Assault |
| Conviction County: | Fulton County, GA Superior Court |
| Sentence Date: | 02/06/2006 |
| Case Number: | 05SC32347 |
| Sentence Length: | Confinement 6 months / Probation 4 years and 6 months |

| | |
|---|---|
| Arrest Date: | 11/16/2005 |
| Offense: | Robbery |
| Conviction County: | Fulton County, GA Superior Court |
| Sentence Date: | 07/31/2006 |
| Case Number: | 05SC37801 |
| Sentence Length: | 5 years, 1 year time served, 4 years probation |

| | |
|---|---|
| Arrest Date: | 01/05/2007 |
| Offense: | Possession of a Firearm by Convicted Felon / School Zone |
| Conviction County: | Fulton County, GA Superior Court |
| Sentence Date: | 10/15/2007 |
| Case Number: | 07SC52865 |
| Sentence Length: | Confinement 2 years, Concurrent suspended sentence 3 years |

On 10/26/2011, ATF Special Agent Nick DeGennaro traveled to the Fulton County Superior Court and confirmed the aforementioned convictions and obtained certified copies.

## Interstate Nexus

24.  On October 25, 2011, your affiant spoke with ATF S/A Stephen Kosch, an ATF as an interstate nexus expert, trained in determining how firearms and/or ammunition travel in and affect interstate or foreign commerce. Based upon S/A Kosch's training and experience he advised the aforementioned firearms listed above, with the exception of the MasterPiece Arms, Model MPA930T, Mini 9, 9mm caliber pistol, serial number F12069, were manufactured outside of the State of Georgia, and since the firearms were possessed within the State of Georgia, the firearms traveled in or affected interstate commerce. S/A Kosch provided that the MasterPiece Arms firearm was manufactured in the State of Georgia.

25.  The make and model of each firearm was provided to S/A Kosch by your affiant verbally, and your affiant will note that a final interstate nexus determination cannot be completed / finalized until such a time as the firearms are visually and physically inspected by an interstate nexus expert and all markings upon the individual firearms are independently reviewed.